INTERSTATE BUILDING & LOAN ASS'N v. EDGEFIELD HOTEL CO.

(Circuit Court, D. South Carolina. February 2, 1903.)

1. BUILDING AND LOAN ASSOCIATIONS—CONTRACT OF BORROWING STOCKHOLDER—LAW GOVERNING.

The contract of a borrowing stockholder in a building and loan association is governed by the law of the state in which the association is incorporated and has its home office, although the security may be situated in another state, where the subscription to stock was made and accepted at the home office, and the stock installments, which are ultimately to extinguish the loan, are there payable, as well as the interest by the terms of the bond given for the loan.

2. SAME—CONSTRUCTION OF CONTRACT — ACCOUNTING BETWEEN ASSOCIATION AND BORROWING STOCKHOLDER.

The bond of a borrowing stockholder in a building and loan association provided that his payments of installments on his stock and of interest should continue until the stock was matured by reaching par value. It also contained the following provision: "It is further understood that, upon final settlement with the association, it shall retain as installment on the said stock and interest no greater sum than the

---

¶ 1. What law governs usury in contracts of building and loan associations, see note to Kirlicks v. Association, 51 C. C. A. 319.

amount actually advanced, with interest thereon at the rate of eight per cent. per annum." *Held* that, the association having become insolvent before the maturity of the stock, the borrower was entitled to make final settlement under such provision, being charged with the loan and 8 per cent. interest thereon, and credited with installments of stock and interest paid as partial payments thereon.

8. Equity Pleading—Affirmative Relief to Defendant—Necessity of Cross-Bill.

    A defendant in equity can only be given affirmative relief on a cross-bill.

In Equity.  Suit to foreclose a mortgage.

 W. A. Wimbish and Mitchell & Smith, for complainant.

Tompkins & Alston, Tompkins & Wells, and N. G. Evans, for defendant.

SIMONTON, Circuit Judge.  This is a bill for the foreclosure of a mortgage executed by the Edgefield Hotel Company, a corporation of the state of South Carolina, to the Interstate Building & Loan Association, a corporation of the state of Georgia.  In this opinion the complainant will be styled the "Association," and the defendant will be spoken of as the "Hotel Company."  The home office of the complainant is the city of Columbus, in the state of Georgia.  It is a building and loan association, pure and simple.  On the 16th of September, 1892, the hotel company made application for 120 shares of the capital stock of the association; payment therefor to be made according to its by-laws.  The application was made at the home office of the association, at Columbus, and was there granted, after consideration by the board of directors.  A certificate of stock was issued on the 20th of September, 1892, to the hotel company, for 120 shares in the association, par value of each $100,—in all, $12,000; the certificate, upon its face, stating that it was subject to certain terms.  These terms and conditions are:  First. The shareholder agrees to pay 60 cents monthly on each share until such share matures or is withdrawn.  Second. That moneys from members to the association, or from the association to members, shall be due and payable at the home office, in Columbus, Ga.  If members of any local branch exercise the rights given them to elect a local treasurer, they may make payments to him for transmission to the home office.  In such case the local treasurer shall be deemed the agent of the member, and not the agent of the association.  Third. Fifty cents of each monthly payment on each share shall go into the loan fund; the remainder, to the expense fund.  No part of the loan fund to be used for expenses.  Fourth. Provides for fines for failure to pay monthly payments.  Fifth. Provides for cases of default after six months.  Sixth. Provides for transfer of stock.  Seventh. Provides for reduction of stock.  Eighth. Provides for withdrawal of stock.  If a member die within one year after a subscription, his personal representative may withdraw his shares.  This is the only case in which shares not held one year can be withdrawn.  If a share be withdrawn at any time after one year from date of certificate, and within two years, the withdraw-

---

¶ 3. See Equity, vol. 19, Cent. Dig. § 450.

ing member shall be entitled to receive a sum of money equal to the amount he has paid in by monthly payments on loan fund. If he withdraw at any time after two years, he is entitled to receive all sums paid by him monthly on the loan fund, with 6 per cent. annual interest, upon 60 days' notice. Stockholders who borrow money cannot withdraw their shares until the loan is paid. All matured shares can be withdrawn at any time, with all profits. Ninth. Once a year, profits will be ascertained, and apportioned among shares in good standing. Tenth. When a loan is made to a shareholder, he must transfer his certificate to the association as collateral for the loan, to be held until the loan and interest are paid, or such share has matured. When this is done, the certificate shall be canceled. Eleventh. The certificate contains a contract between the association and the holder of the shares, and no agent has authority to change it in any way.

Being the owner of 120 shares in the association, the Edgefield Hotel Company on the 15th of September, 1892, made application for a loan of $6,000; proposing, as security therefor, the transfer of the 120 shares as collateral, a personal bond for $12,000 for the payment of the installments and interest on the shares of stock; said bond to be secured by a mortgage of the property set out in this bill. The application was granted. The loan was made, and all the papers were executed. At the date of this loan the hotel company had paid $120 admission fee, and one payment of its stock of $72. After the loan was made, it made 74 payments, of $102 each, to wit, $72 on 120 shares, at 60 cents each, and $30 interest. These payments were made promptly each month until the month of December, 1898, for which month payment in full was made. Thereafter nothing was paid. In March, 1901, this bill was filed. It is, as has been said, for the foreclosure of a mortgage of realty. The bond given with the mortgage on whose default is based the right of foreclosure, is for the penal sum of $12,000. This condition will be commented on hereafter. Among other things in the bond, it is provided that, in case of failure to fulfill any of its conditions, the whole sum becomes due and payable. The bill charges default, and prays foreclosure thereon. The answer, which is not artistically drawn, after admitting the corporate character of the two parties, and the loan of the money, and the execution of the papers securing it, avers payment of the entire sum legally due on the contract by the installments paid by it from month to month as alleged. It also avers that it was induced to make the loan by that portion of the contract wherein it appears as follows: "And upon final settlement with the association, it is to retain, as installments of said stock and interest, no greater sum than the amount actually advanced thereon, at the rate of eight per cent. per annum"—and that, persuaded that it would not be called upon to pay more than this, it made the loan; that it has paid more than this on the bond. It also charges that the construction put on the contract by the complainant made it usurious, and so in conflict with the statute law of the state of South Carolina, which law entered into and controls the contract. The rest of the answer is for affirmative relief, and cannot be considered. Fost. Fed. Prac. § 170; 3 Daniell, Ch. (Perkins' 3d Am. Ed.) p. 1647.

The first question made in this case is by what law the contract is to

be construed—that of Georgia or of South Carolina. The relations between the complainant and the defendant grow out of the fact that the defendant is a shareholder in the complainant corporation. In order to secure this relation the defendant made application to the complainant for 120 shares of its capital stock, at Columbus, in the state of Georgia. That application was received, considered, and granted at Columbus. The subscription was made in that city; the admission fee paid to it there. The certificate of stock which completed and crystallized the subscription is a contract, and its conditions are stated in it. Among these are the payments of monthly installments on the stock at Columbus, Ga. When the loan was effected and the bond given, the condition of the bond required payments to the complainant at its principal office, in the city of Columbus, Ga., on a certain day therein mentioned, each month; that is to say, $72 of the monthly installments on the shares, and $30 as interest on the loan. The prompt payment of these sums secured the final payment of the bond. It is clear that, whatever may have been the place where this contract was made, the place of its performance was Columbus, in the state of Georgia. In Bedford v. Association, 181 U. S. 242, 21 Sup. Ct. 597, 45 L. Ed. 834, the supreme court quotes with approval the language of Miller v. Tiffany, 1 Wall. 298, 17 L. Ed. 540:

"The general practice in relation to contracts made in one place, to be performed in another, is well settled. They are to be governed by the law of the place of performance; and, if the interest allowed by the law of the place of performance is higher than that permitted by the place of contract, the parties may stipulate for the higher interest without incurring the penalties of usury."

The same case quotes with approval the case of Loan Co. v. Cannon, 96 Tenn. 599, 36 S. W. 386, 33 L. R. A. 112, 54 Am. St. Rep. 858. A note and mortgage were given to a building and loan association, and made payable at Minneapolis. This contract is a Minnesota contract, and is expressly authorized by the charter of the company and the laws of the state. In this court the law is fully stated, and the cases sustaining it quoted, in McIlwaine v. Ellington, 49 C. C. A. 446, 111 Fed. 584, 585, 55 L. R. A. 933, Fourth circuit, and the same doctrine established. It would seem clear, therefore, that this contract, even if made in South Carolina, inasmuch as it expressly provides for performance in Georgia, must be construed according to the law of Georgia, and this is in consonance with the decisions of the supreme court of South Carolina. Pollock v. Association, 51 S. C. 420, 29 S. E. 77, 64 Am. St. Rep. 683. In a case on all fours with this (Investment Co. v. Alexander, 96 Fed. 872), this court said:

"The application for membership in the complainant corporation was with the intent and purpose of obtaining this loan. The application was made to the company at Washington, District of Columbia, the home office; was considered and granted there. The certificate of the stock, the result of the application and the basis of the loan, was signed and issued at Washington, the home office. The application for the loan was prepared in South Carolina, but it was forwarded to Washington to be passed upon there. Until it was passed upon and accepted, it was no contract. It was accepted in Washington, and so the contract was completed and made in Washington."

7 Am. & Eng. Enc. Law (2d Ed.) 137; Shattuck v. Insurance Co., 4 Cliff. 589, Fed. Cas. No. 12,715.

Under the law of Georgia, a contract like this is not usurious. Code Ga. 1895, § 2401; Cook v. Association, 104 Ga. 814, 30 S. E. 911.

What, then, is the contract? The bond and mortgage were drawn in South Carolina, and are being enforced in that state. The law of South Carolina will be followed in this court, so far as it may concern the proceedings for foreclosure, and manner and terms of the sale, the redemption of the land from the sale, and all things incident thereto. Brine v. Insurance Co., 96 U. S. 627, 24 L. Ed. 858; Insurance Co. v. Cushman, 108 U. S. 51, 2 Sup. Ct. 236, 27 L. Ed. 648. The present question is not as to the mode of enforcing a contract by foreclosure, but what is the amount due under the contract, decided by the law of the state of Georgia, and the contract itself. The contract is set out in the bond as follows:

"Whereas, the said corporation, the Edgefield Hotel Company, is a member of the said association in the branch at Edgefield, and owns in its own right 120 shares of the capital stock, and has, under the terms and conditions of the charter and by-laws, procured from the said association a loan of $6,000 on the said 120 shares of stock, and a mortgage on certain real property; and whereas, under the condition prescribed in the by-laws, said loan is to be paid to the association in monthly installments upon the said stock, and the interest on the sum loaned also to be paid monthly, as may be provided in its charter and by-laws, and rules and regulations, in direct reference to which this bond is made [that is to say, we assume, the by-laws in force at the date of the contract], and is in all cases to be construed as making said by-laws, rules, and regulations, when the same are applicable, as a part thereof, the payments of which installments and interest are to continue until the said shares of stock mature (that is, until each share of the stock borrowed shall, by the installments paid on it, together with its declared proportion of profits, reach the par value of $100.00), and to pay all taxes and keep all houses on the lot mortgaged insured until the said shares mature."

There is a further clause in the bond, as follows:

"It is further understood that upon final settlement with the association it shall retain as installment on the said stock and interest no greater sum than the amount actually advanced, with interest thereon at the rate of eight per cent. per annum."

There thus appear two alternatives to the borrower: He is, in addition to the amount fixed for interest, to repay said loan to the association in monthly installments on the said stock, and to do this until each share of the stock matures; that is, until each share of stock borrowed upon shall, by the installments paid on it, with its proportionate share of profits, reach a par value of $100. Or he can have a final settlement with the association if the installments on stock and interest paid equal the sum actually lent, with interest thereon at the rate of 8 per cent. per annum. In the case at bar the defendant has paid on its first subscription $72, and has made subsequently 74 other payments of $102 each, beginning December, 1892; that is, in all, $7,548; the last payment having been made for December, 1898. But the interest on $6,000 from November, 1892, to December, 1898, six years and one month, at 8 per cent. per annum, is $2,920, making a total due on that account of interest of $8,920. So, if we take the date of reusal to pay installments as a date of final accounting, this provision of the bond has not been fulfilled. As under the other alternative the

obligor binds itself to go on and pay on the loan by installments on the stock, $72 each month, the loan not having been repaid in this way, it was bound to pay until the loan was repaid, or until the sums paid on each share of the stock reached its par value of $100. This term "the par value of each share of stock" is ambiguous. If it means until each share is of the value of (that is, was worth) $100, the payments might go on indefinitely. For, as the shares were entitled to profits, each share was also liable for losses. So it may happen (indeed, in the case at bar it did happen) that no share ever reached the value of $100. The association has proved insolvent. The proper construction of the phrase, as used here, is when the whole sum of $100 per share has been paid. For this reason, doubtless, the alternative provision was inserted in the bond. The bill was filed in March, 1901. From December, 1898, all the months of 1899, 1900, January, and February, 1901, the defendant was in default—26 months, at $102 per month; that is to say, for $3,652. In this court, however, the defendant will be allowed to take the most favorable alternative, and to make a final settlement by estimating the amount due on the loan, with interest from its date at 8 per cent. per annum until day of settlement, and crediting it with all payments made on account of interest and stock. It is contended that these payments on account of interest and stock cannot bear interest, and to this point is quoted Buist v. Bryan, 44 S. C. 129, 21 S. E. 537, 29 L. R. A. 127, 51 Am. St. Rep. 787. For this rule the learned justice who delivered the opinion of the court gives no reason whatever. Apart from this, the rule he lays down is the law of South Carolina, and is an exception to the general law. But as we have seen, the contract is governed by the law of Georgia. There is nothing in the record to show that the law of Georgia is the same as in South Carolina. At all events, the law which governs this case is the law of partial payments, and must be applied here. The complainant also charges counsel fee under the contract. But this, too, is under the law of South Carolina, which validates such contracts. It was said at bar, and not disputed, under the law of Georgia such a contract is invalid. If this be so, this being a Georgia contract, the clause is disallowed. This point is reserved.

It is ordered that the standing master state the account between the complainant and defendant; that in doing so he charge the defendant with the sum loaned, $6,000, with interest at the rate of 8 per cent. per annum from the date of the loan, crediting it with each monthly payment, including the first payment made by it, and following the rule of partial payments (that is to say, including interest up to the first payment; if the amount then paid exceeds interest, deducting it from the amount then due, and using the results as a new principal, to be disposed of in the same way). He will report the result of this to the court.

The defendant claims credit for the withdrawal value of the shares, and it is expressly stipulated that a shareholder who has borrowed money cannot withdraw his shares, and so it is not entitled to the withdrawal value. It also claims that it is entitled to a share of the profits. Nothing appears in the record as to the profits,—certainly for several years last past. The fact that the association is insolvent

indicates that there are no profits. Those portions of the answer which seek affirmative relief, and so were not considered, proceed entirely on the proposition that the contract was usurious. This proposition has not been accepted.